### UNITED STATES v. BARENO et al.
#### Criminal No. 19959.

District Court, D. Maryland.
June 5, 1943.

Bernard J. Flynn, U. S. Atty., of Baltimore, Md., for the United States.

Lawrence F. Sherman, of New York City, and William Curran, Simon E. Sobeloff, Southgate L. Morrison, and Robert R. Carman, all of Baltimore, Md., for defendants.

COLEMAN, District Judge.
Judge.

This case is now before the Court on demurrers to the indictment filed on behalf of each of the five defendants.

The indictment is in three counts. The first count charges that the defendants unlawfully, wilfully, knowingly and feloniously carried aboard an exporting carrier, namely, the Spanish S. S. Motomar, at Baltimore, for export, twenty pounds of platinum, more or less, without first presenting to the Collector of Customs of the Port of Baltimore a license so to do; and the second count charges that the defendants loaded the platinum on the steamship, the acts embraced in both of these counts being alleged to be contrary to the requirements of Sec. 801.2 as amended, and 801.7 of the General Regulations of the Board of Economic Warfare promulgated pursuant to Sec. 6 of the Act of July 2, 1940, as amended by Public Law 638, 77th Congress, chap. 461, Second Session, 54 Stat. 714, 50 U.S.C.A.Appendix, § 701. The third count charges a conspiracy to commit the offenses charged in the first and second counts, contrary to 18 U.S.C.A. § 88.

Section 6 of the Act of July 2, 1940, entitled an act "to expedite the strengthening of the national defense", provides as follows: "Whenever the President determines that it is necessary in the interest of national defense to prohibit or curtail the exportation of any military equipment or munitions, or component parts thereof, or machinery, tools, or material, or supplies necessary for the manufacture, servicing, or operation thereof, he may by proclamation prohibit or curtail such exportation, except under such rules and regulations as he shall prescribe. Any such proclamation shall describe the articles or materials included in the prohibition or curtailment contained therein. In case of the violation of any provision of any proclamation, or of any rule or regulation, issued hereunder, such violator or violators, upon conviction, shall be punished by a fine of not more than $10,000, or by imprisonment for not more than two years, or by both such fine and imprisonment. The authority granted in this section shall terminate June 30, 1942, unless the Congress shall otherwise provide." The amendment by the Act of June 30, 1942, entitled an act "to further expedite the prosecution of the war by authorizing the control of the exportation

of certain commodities", provides as follows:

"Section 6 of the Act of July 2, 1940 (54 Stat. 714) is hereby amended to read as follows:

"Sec. 6. (a) The President is hereby authorized to prohibit or curtail the exportation of any articles, technical data, materials, or supplies, except under such rules and regulations as he shall prescribe.

"(b) Unless the President shall otherwise direct, the functions and duties of the President under this section shall be performed by the Board of Economic Warfare.

"(c) In case of the violation of any provision of any proclamation, rule, or regulation issued thereunder, such violator or violators, upon conviction, shall be punished by a fine of not more than $10,000, or by imprisonment for not more than two years, or by both such fine and imprisonment.

"(d) The authority granted by this section shall terminate on June 30, 1944, or upon any prior date which the Congress by concurrent resolution, or the President, may designate; except that as to offenses committed, or rights or liabilities incurred prior to such date, the provisions of this section and such rules, regulations, and proclamations shall be treated as remaining in effect for the purpose of sustaining any suit, action, or prosecution with respect to such right, liability, or offense."

Section 801.7 of the General Regulations of June 30, 1942, of the Board of Economic Warfare, Fed. Register July 2, 1942, Vol. 7, § 129, page 5001, provides as follows: "Presentation for export. No articles, materials, or supplies the exportation of which is prohibited or curtailed pursuant to Section 6 of the Act of July 2, 1940, 54 Stat. 714, as amended, shall be loaded or carried onto an exporting carrier for export by water or by air or presented to such an exporting carrier for loading or presented to the collector of customs for inspection and clearance for exportation until an original license therefor, or such other document as may be authorized in these regulations, has been presented to the collector of customs at the port at which the controlled item is to be so loaded, carried, or presented * * *." Platinum is embraced within this section by Sec. 801.2 of the General Regulations, Fed.Register July 2, 1942, Vol. 7, § 129, page 4989. As will be

seen by subsection C of Section 6 of the Act of July 2, 1940, as amended, above quoted, a violation of Section 801.7 of the General Regulations constitutes a violation of this subsection C.

The two major contentions made by the demurrers to the indictment are (1) that the Act of July 2, 1940, as amended by the Act of June 30, 1942, is unconstitutional in that it attempts to delegate legislative powers to the President; and (2) that the procedure followed by the Executive Officers of the Board of Economic Warfare in promulgating Section 801.7, above quoted, of the General Regulations of June 30, 1942, was not a valid administrative procedure. Several other points have been presented by counsel for the defendants in support of the demurrers, but we do not consider it necessary to consider them because at the hearing the Court was given to understand that no real reliance was being placed upon them.

We will consider the two major grounds raised in opposition to the demurrer, in the order which they have just been stated. First, therefore, as to the claim that the indictment must be quashed because the Act of July 2, 1940, as amended by the Act of June 30, 1942, upon which the indictment is based, constitutes an unconstitutional attempt to delegate legislative powers to the Executive Branch of the Government.

We believe that this contention is without merit. It is to be noted that the first of these Acts was passed prior to our entrance into the War, although our involvment even at that time, July 2, 1940, seemed fairly imminent. This first Act is entitled "An Act to expedite the strengthening of the national defense", and the prohibition or curtailment of exports for which it provided was limited to what the President might determine to be "necessary in the interest of national defense" in the matter of military equipment or munitions or machinery, tools, or material, or supplies necessary for the manufacture, etc., of such things. However, the amendment of June 30, 1942, passed after we had been at War for more than six months, was, by its title, enacted expressly "to further expedite the prosecution of the war by authorizing the control of the exportation of certain commodities", and the body of the Act, consonant with its title, authorized the President "To prohibit or curtail the exportation of *any articles, technical data, materials* *or supplies, except under such rules and regulations as he shall prescribe*". (Italics inserted.)

The contention is made that this unlimited power given to the President to prohibit or curtail the exportation of *anything,* regardless of whether it has any relation to the War effort, constitutes a delegation of legislative power which is impliedly forbidden by the Constitution as expressly announced by decisions of the Supreme Court.

In support of this position, counsel for the defendants rely upon such decisions as: Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446; Schedter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947; United States v. Rock Royal Cooperative, Inc., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446; Opp Cotton Mills v. Administrator, 312 U.S. 126, 657, 61 S.Ct. 524, 85 L.Ed. 624; Pittsburg Plate Glass Co. v. National Relations Labor Board, 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251. We do not, however, consider it necessary to analyze each one of these decisions because in one of the latest of them, namely, Opp Cotton Mills v. Administrator, the Supreme Court has clearly and succinctly laid down the test by stating (312 U. S. page 144, 61 S.Ct. page 532, 85 L.Ed. 624) that where "the standards set up for the guidance of the administrative agency, the procedure which it is directed to follow and the record of its action which is required by the statute to be kept or which is in fact preserved, are such that Congress, the courts and the public can ascertain whether the agency has conformed to the standards which Congress has prescribed, there is no failure of performance of the legislative function."

The original Act, that is, the Act of July 2, 1940, gave to the President the power to make rules and regulations prohibiting or curtailing the exportation of certain specified things after the President had determined that it was necessary in the interest of national defense so to do. We believe that this first Act substantially meets the requirements as laid down by the Supreme Court. The amendment of June 30, 1942, because of the existence of War, removed from the President any limitation with respect to the character of the things the exportation of which might be prohibited or curtailed, but retained the same requirement for prescribing rules and

regulations with respect to any prohibition or curtailment. In addition it was more specific than the original Act in that it provided that "Unless the President shall otherwise direct, the functions and duties of the President under this section shall be performed by the Board of Economic Warfare," and further, presumably speculating as to the time within which peace would have been restored and the necessity of very great restrictions upon exports would have ceased, provided that "The authority granted by this section shall terminate on June 30, 1944 or upon any prior date which the Congress by concurrent resolution, or the President, may designate * * *."

■ In considering this question as to the character and extent of the delegation of legislative power to the Executive, we must take into account the distinction that exists between the right to challenge the delegation where it relates solely to internal affairs and where it relates to foreign affairs, and more especially, where, as in the present case, it relates to the powers and function of the President as Commander-in-Chief of the Army and Navy in the prosecution of the war in which our country is engaged. Such a distinction was clearly made in United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255. That decision upheld, as a constitutional delegation of legislative power to the President, a joint resolution of Congress of May 28, 1934, whereby the President was authorized to prohibit the sale, except under such limitations and exceptions as he might prescribe, any arms or munitions of war in any place in the United States to those countries that were then engaged in armed conflict in the Chaco. The Supreme Court said (pages 315, 316, 319, 320 of 299 U.S., 57 S.Ct. page 219, 81 L.Ed. 255):

"It will contribute to the elucidation of the question if we first consider the differences between the powers of the federal government in respect of foreign or external affairs and those in respect of domestic or internal affairs. That there are differences between them, and that these differences are fundamental, may not be doubted.

"The two classes of powers are different, both in respect of their origin and their nature. The broad statement that the federal government can exercise no powers except those specifically enumerated in the Constitution, and such implied powers as are necessary and proper to carry into effect the enumerated powers, is categorically true only in respect of our internal affairs. In that field, the primary purpose of the Constitution was to carve from the general mass of legislative powers then possessed by the states such portions as it was thought desirable to vest in the federal government, leaving those not included in the enumeration still in the states. Carter v. Carter Coal Co., 298 U.S. 238, 294, 56 S.Ct. 855, 80 L.Ed. 1160. That this doctrine applies only to powers which the states had is self-evident. And since the states severally never possessed international powers, such powers could not have been carved from the mass of state powers but obviously were transmitted to the United States from some other source. During the Colonial period, those powers were possessed exclusively by and were entirely under the control of the Crown. By the Declaration of Independence, 'the Representatives of the United States of America' declared the United (not the several) Colonies to be free and independent states, and as such to have 'full Power to levy War, conclude Peace, contract Alliances, establish Commerce and to do all other Acts and Things which Independent States may of right do.' * * *

■ "It is important to bear in mind that we are here dealing not alone with an authority vested in the President by an exertion of legislative power, but with such an authority plus the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress, but which, of course, like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution. It is quite apparent that if, in the maintenance of our international relations, embarrassment—perhaps serious embarrassment—is to be avoided and success for our aims achieved, congressional legislation which is to be made effective through negotiation and inquiry within the international field must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved. Moreover, he, not Congress, has the better opportunity of knowing the conditions which prevail in for-

eign countries, and especially is this true in time of war. He has his confidential sources of information. He has his agents in the form of diplomatic, consular and other officials. Secrecy in respect of information gathered by them may be highly necessary, and the premature disclosure of it productive of harmful results. * * *"

If, as has just been indicated, broad authority may be delegated to the President as a necessary incident to the exercise of his constitutional authority with respect to international relations when our country is itself at peace, a fortiori must the same principle apply when our country is at war. And so it has been clearly stated by the Supreme Court. For example, in United States v. Chemical Foundation, 272 U.S. 1, 47 S.Ct. 1, 71 L.Ed. 131, it was held that the granting of power to the President, under the Trading with the Enemy Act, 50 U.S.C.A.Appendix, § 1 et seq., to determine the terms of sale of enemy properties in the light of conditions arising in the progress of the last war with Germany, was not an unconstitutional delegation of legislative power. There the Court said (pages 11, 12 of 272 U.S., page 5 of 47 S.Ct., 71 L.Ed. 131): "While not denying the power to confiscate enemy properties, the United States argues that as construed below, the provision in question is unconstitutional because it attempts to delegate legislative power to the Executive. But the act gave the Custodian acting under the President, full power of disposition. No restriction was put upon dispositions other than by sales. And sales to the United States were not regulated. The general rule laid down was that all dispositions by sale or otherwise should be made in accordance with the determinations of the President; the proviso made an exception including a class of sales; and, upon the failure of the President otherwise to determine stating the reasons therefore in the public interest, it required that such sales should be made as there specified. It was not necessary for Congress to ascertain the facts of or to deal with each case. The act went as far as was reasonably practicable under the circumstances existing. It was peculiarly within the province of the Commander-in-Chief to know the facts and to determine what disposition should be made of enemy properties in order effectively to carry on the war. The determination of the terms of sales of enemy properties in the light of facts and conditions from time to time arising in the progress of war was not the making of a law; it was the application of the general rule laid down by the act. When the plenary power of Congress and the general rule so established are regarded, it is manifest that a limitation upon the excepted class is not a delegation of legislative power. Field v. Clark, 143 U.S. 649, 692, 12 S.Ct. 495, 36 L.Ed. 294; Buttfield v. Stranahan, 192 U.S. 470, 496, 24 S.Ct. 349, 48 L.Ed. 525; Union Bridge Co. v. United States, 204 U.S. 364, 377, 27 S.Ct. 367, 51 L.Ed. 523; United States v. Grimaud, 220 U.S. 506, 516, 31 S.Ct. 480, 55 L.Ed. 563."

Again, in Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446, the Court had before it the question of the constitutionality of the delegation to the President, by Section 9(c) of the National Industrial Recovery Act, 48 Stat. 195, 200, of power to prohibit the transportation in inter-state and foreign commerce of petroleum and petroleum products produced or withdrawn from storage in excess of amounts permitted by State authority. In holding that such attempted delegation was void because no where in the Act had Congress declared or indicated any policy or standard to guide or limit the President, the Court referred to the distinction between delegation of power with respect to international matters and those matters which are purely of domestic character.

Admittedly, the delegation of power to the President under the Act now before us is broader than any heretofore given to a President by Congress. But its unlimited character does not, per se, render the delegation invalid. In the present War, there is scarcely a thing normally in common civilian use which is not needed for the prosecution of the War. This has never been true in previous wars. So, what Congress may heretofore have deemed it necessary to do by way of delegation of authority, in order to insure no escape or wastage of critical products or materials, is not the criterion. The test is whether there is, at the present time, a reasonable basis for the broader delegation. We are satisfied that there is. Completely altered methods of waging war today may very well justify complete change in the regulation of *everything* believed to be necessary for the perfection of those new methods of war.

It follows that the Act of July 2, 1940, as amended by the Act of June 30, 1942, does not represent any unlawful dele-

gation of legislative powers to the President. So we will pass to a consideration of the second major contention raised by the demurrers to this indictment in the present case, namely, that the procedure followed by the Executive Officers of the Board of Economic Warfare in promulgating Section 801.7 of the General Regulations of June 30, 1942, was an invalid administrative procedure.

This second contention rests upon the theory that assuming that the Board of Economic Warfare had authority itself to make the regulations for the violation of which the present defendants have been indicted, nevertheless, the Board's delegation of such authority to its Executive Director, and a redelegation by him to the Assistant Director in Charge of the Office of Exports and, thereafter, the two additional redelegations,—one by the last named person to the Acting Assistant Director in Charge of the Office of Exports and by the latter, a final delegation to the Chief of the Export Control Branch of the Office of Exports, or, in his absence, to the officer designated by the Branch Chief to act for him, constitute an invalid delegation of administrative authority.

It is a fact that delegation of authority took place four times in the manner just described. Was such delegation improper? As we have already seen, Section 6(b) of the Act of July 2, 1940, as amended by the Act of June 30, 1942, provides that: "Unless the President shall otherwise direct, the functions and duties of the President under this section shall be performed by the Board of Economic Warfare." By Section 6(c) of the Act, the Board of Economic Warfare is given—not expressly, but by clear implication—power to issue proclamations, rules and regulations. The President has made no other direction and, therefore, the Board of Economic Warfare has remained the only agency authorized to perform the functions and duties of the President under the Act.

The history of this Board from its creation is as follows: It came into being first as the Economic Defense Board, by virtue of Executive Order No. 8839 of July 30, 1941. This Order provided that the Economic Defense Board shall consist of the Vice-President of the United States, who shall serve as Chairman, of the Secretary of State, the Secretary of the Treasury, the Secretary of War, the Attorney General, the Secretary of the Navy, the Secretary of Agriculture and the Secretary of Commerce. On December 17, 1941, the name of this Board was changed to the Board of Economic Warfare by Executive Order No. 8982, but no change took place in the organization or powers of the Board.

Section 7 of Executive Order No. 8839 by which, as we have seen, the Board was originally created, authorized the Chairman of the Board *"to make all necessary arrangements, with the advice and assistance of the Board, for discharging and performing the responsibilities and duties required to carry out the functions and authorities set forth in this Order,* and to make final decisions when necessary to expedite the work of the Board." (Italics inserted.) This Executive Order was amended on September 15, 1941, by Executive Order No. 8900, Section 1 of which authorized the Board, among other things, to *"exercise and perform all powers and functions * * * under section 6 of the act of July 2, 1940, * * *."* Section 3 of this same Order provided that *"the Chairman of the Economic Defense Board is authorized to discharge and perform the above described responsibilities and duties through the Executive Director of the Board."* (Italics inserted.) The Executive Director of the Board obtained his authority to act through the Board's Order No. 1 of September 15, 1941, which included power "to delegate, and provide for the redelegation of, such of said powers and functions as may from time to time be required." Fed.Reg. Sept. 20, 1941, vol. 6, p. 4828. The Executive Director of the Board, in conducting its affairs, did in fact exercise this power given to him to redelegate. See Administrative Order No. 1, September 15, 1941, Fed.Reg. Sept. 20, 1941, vol. 6, p. 4818.

■ As we have seen, the amendment of June 30, 1942, to the Act of July 2, 1940, made no change in the administrative organization of the Board of Economic Warfare. It merely left the President free to transfer his statutory functions and duties to another board or agency, if he saw fit to do so, but he has made no change with respect to the administration of the Act. Thus, there is no reasonable basis for saying the amendment of June 30, 1942, repealed the Executive Orders which created the Board of Economic Warfare and fixed the powers of its Executive Officers. There is no basis for the implication, therefore, that Executive Orders Nos. 8839 and

8900 were amended or altered by virtue of the amendment of June 30, 1942, to the original Act of July 2, 1940, because, as a matter of fact, the original Act was not itself repealed, but merely amended, and there is nothing in the amendment that indicates either expressly or impliedly, an intention to disturb the pre-existing Administrative procedures of the Board that had been set up pursuant to previous Executive Orders. Indeed, recognition of the administration of export control on behalf of the President through the agency of the Board of Economic Warfare, and intention to continue the same administration, expressly appears from the report of the Senate Military Affairs Committee of June 8, 1942, which, in recommending the enactment of June 30, 1942, stated: "Subsection (b) continues the present administration of export control, unless the President otherwise directs. It is the opinion of this Committee that, in the interest of sound public policy, the Board of Economic Warfare is properly charged with this duty." The then administration of export control was the Board of Economic Warfare, and none other. Furthermore, there is nothing repugnant between the two Acts. The later Act merely broadens the powers of the President because a state of War had arisen since the passage of the original Act, and extends the effective date of the original Act. The penalties for violation were kept the same. See United States v. Borden Company, 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181; Posadas v. National City Bank, 296 U.S. 497, 56 S.Ct. 349, 80 L.Ed. 351.

Finally, we turn to a more detailed consideration of precisely how the General Regulations of June 30, 1942, Sec. 801.7, which form the basis of the present indictment, were promulgated and administered.

The first step is to be found in Order No. 3 of June 30, 1942, of Vice-President Wallace, as Chairman of the Board of Economic Warfare, authorizing and directing the Executive Director (Milo Perkins) of that Board, "subject to my general supervision and direction, to exercise and perform the powers and functions contained in Section 6 of the Act of July 2, 1940, 54 Stat. 714, 50 U.S.C. (1940 ed.) 701, as amended by the Act of June 30, 1942, 77th Congress, 2nd Session, and to issue such rules and regulations as may be necessary or proper to carry out the provisions of said Acts. *The Executive Director is hereby further authorized to delegate, and provide for the redelegation of, such of these powers and functions, including the power to issue rules and regulations, as may from time to time be required."* (Italics inserted.) Fed.Reg. July 2, 1942, vol. 7, No. 129, p. 4951.

The second step in the administrative procedure is found in an Order of the same date by Milo Perkins, Executive Director of the Board of Economic Warfare, whereby he delegated the power just given to him by Mr. Wallace "to the Assistant Director in Charge of the Office of Exports or, in his absence, the officer designated by said Assistant Director to act for him," and the Order contained a power of redelegation similar to that which Mr. Wallace had conferred upon Milo Perkins. Fed.Reg. July 2, 1942, vol. 7, No. 129, p. 4951.

The third step in the administrative procedure is embodied in Order of the same date by John C. Foulis, Acting Assistant Director in Charge of the Office of Exports, wherein he recites that "by virtue of the authority vested in me, as Acting Assistant Director in Charge of the Office of Exports, authority is hereby delegated to the Chief of the Export Control Branch of the Office of Exports or, in his absence, the officer designated by said Branch Chief to act for him, to exercise and perform all powers and functions, including the power to issue rules and regulations, relating to the control of exportation of articles, commodities, technical data, etc., provided for in paragraph (1) of the order of the Executive Director, dated June 30, 1942, and to delegate, and provide for the redelegation of, such of these powers and functions as may from time to time be required, provided that the authority to issue rules and regulations may not be so delegated." Fed. Reg., July 2, 1942, vol. 7, No. 129, p. 4951.

The fourth and last step is represented by the issuance of general regulations by F. R. Kerr, Colonel Infantry, Chief, Export Control Branch, Office of Exports, prohibiting the exportations of hundreds of articles, materials and supplies, "unless and until an applicable license authorizing such exportation shall have been issued". Platinum is on the prohibited list. Fed.Reg. July 2, 1942, vol. 7, No. 129, pp. 4952, 4989.

We believe there is nothing invalid about this delegation and re-delegation of authority to act. Heads of Government departments and boards must act, and presumably have been acting time out of mind, vicari-

ously in the performance of their routine business. It is impossible for them to do otherwise and dispose of the large volume of work. But they still remain, as did the Vice President in the present case, responsible for the acts of their subordinates.

█ We conclude from the foregoing chronology of the steps taken by the Board of Economic Warfare, as part of its administrative procedure leading up to the promulgation of Section 801.7 of its General Regulations of June 30, 1942, that the successive delegation of authority from one to another of the Executive Officers of the Board was both entirely consistent with the intent of Congress as expressed in the Act of July 2, 1940, as amended by the Act of June 30, 1942, and lawful.

█ For the reasons given the demurrers of each of the defendants to the indictment must be overruled.