**UNITED STATES of America**

v.

**Kenneth BRUMAGE et al.,
Defendants.**

**No. 72 CR 904.**

United States District Court,
E. D. New York.

April 11, 1974.

Edward John Boyd, V, Acting U. S. Atty., E.D.N.Y. by Guy L. Heinemann, Asst. U. S. Atty., Brooklyn, N. Y., for plaintiff.

Howard L. Jacobs, P. C., New York City, for defendant Kenneth Brumage.

Martin & Obermaier, New York City by John S. Martin, Jr., New York City, for defendant Fairmont Electronic Sales Corp.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

Defendants Fairmont Electronic Sales Corporation ("Fairmont") and Kenneth Brumage, a corporate official, have moved to dismiss ten counts of a nineteen count indictment, contending that the statute alleged to have been violated, § 6(b) of the Export Administration Act of 1969 ("the Act"), 50 U.S.C. App. § 2405(b), is unconstitutionally vague. For the reasons which follow, defendants' motion is denied.

Nine of the counts, which are the focus of this motion, charge Fairmont, Brumage and Leon Van Simaeys with having willfully exported items of electronic and technical equipment, primarily oscilloscopes, without a validated export license, knowing (as revealed in the bill of particulars) that these items, although consigned to parties in Belgium, were indirectly destined for East Germany and Hungary, in violation of § 2405(b) and implementing regulations, 15 C.F.R. §§ 370.3, 371.3, 372.1, 387.6, 399.1. The remaining count in question alleges that all the defendants, Fairmont, Brumage, Van Simaeys and Joseph Jabre, conspired to export electronic and technical equipment in violation of the aforementioned provisions, in contravention of 18 U.S.C. § 371.[1]

The Act in controversy essentially continues long-standing regulation of exports from the United States. It authorizes controls for three purposes—national security, foreign policy and short supply. Congressional concern for national security and foreign affairs underlying the Act is emphatically expressed in the House Report accompanying the bill.[2] This concern is also reflected in the Act itself, in the Congres-

---

1. In addition, Fairmont and Brumage are charged in nine counts with knowingly having made fraudulent statements to the Bureau of Customs in shipper's export declarations as to the ultimate destination of the shipments involved in the first nine counts of the indictment in violation of 18 U.S.C. § 1001 and 15 C.F.R. § 386.3.

2. "National security controls are instituted to provide control of exports from the standpoint of their significance to the security of the United States. They include an embargo on exports to Communist China, North Korea, the Communist-controlled area of Vietnam and Cuba, as well as broad controls over exports to the U.S.S.R. and other Eastern European areas. Security controls over exports to other countries apply to a highly selected list of commodities and technical data to prevent their unauthorized diversion or re-export to the foregoing countries.

"Exports to certain non-Communist and Communist countries are controlled to further U. S. foreign policy and to aid the

sional findings in § 2401,[3] in the Congressional declaration of policy in § 2402,[4] as well as in § 2403(b)(1, 2, 4) and (c) and § 2404(a). .

The Export Control Act of 1949, renewed in 1951, 1953, 1956, 1958, 1960, 1962 and 1965, "provides the President with the authority to prohibit or curtail exports from the United States, its territories, and possessions; and authorizes him to delegate this authority. . . . The export control authority, which has been delegated to the Secretary of Commerce, is administered by the Office of Export Control of the Bureau of International Commerce." H.R.Rep.No.524, 1969 U.S.Code Cong. and Admin.News p. 2705.[5]

It would seem that in implementing the broad political, economic and strategic objectives of the Act, the Office of Export Control "has created a veritable labyrinth of regulations concerning what may be exported to what countries under what conditions and by what procedures."[6] Berman and Garson,

United States in fulfilling its international responsibilities. Examples are the controls on the export of hundreds of categories of nonstrategic goods to Eastern Europe, a virtual embargo on exports to Southern Rhodesia, and restrictions on exports of commodities and technical data for use in the development or testing of nuclear weapons, explosive devices, or maritime nuclear propulsion projects."
H.R.Rep.No.524, 1969 U.S.Code, Cong. and Admin.News, p. 2706.

3. Section 2401 provides in pertinent part: "The Congress makes the following findings:
"(1) The availability of certain materials at home and abroad varies so that the quantity and composition of United States exports and their distribution among importing countries may affect the welfare of the domestic economy and may have an important bearing upon fulfillment of the foreign policy of the United States.
"(2) The unrestricted export of materials, information, and technology without regard to whether they make a significant contribution to the military potential of any other nation or nations may adversely affect the national security of the United States."

4. Section 2402 provides in pertinent part: "The Congress makes the following declarations:
"(1) It is the policy of the United States both (A) to encourage trade with all countries with which we have diplomatic or trading relations, except those countries with which such trade has been determined by the President to be against the national interest, and (B) to restrict the export of goods and technology which would make a significant contribution to the military potential of any other nation or nations which would prove detrimental to the national security of the United States.
"(2) It is the policy of the United States to use export controls . . . (B) to

the extent necessary to further significantly the foreign policy of the United States and to fulfill its international responsibilities, and (C) to the extent necessary to exercise the necessary vigilance over exports from the standpoint of their significance to the national security of the United States."

5. The Department of Commerce controls exports through either the issuance of a "validated license" or the establishment of a "general license" authorizing such shipments.
"A validated license is a formal document issued to an exporter by the Department. It authorizes the export of commodities within the specific limitations of the document. It is based upon a signed application submitted by the exporter.
"A general license is a broad authorization issued by the Department of Commerce which permits certain exports under specified conditions. Neither the filing of an application by the exporter nor the issuance of a license document is required in connection with any general license. The authority to export in such an instance is given in the 'Export Control Regulations,' published by the Department of Commerce, which specify the conditions under which each general license may be used."
H.R.Rep.No.524, 1969 U.S.Code Cong. and Admin.News, p. 2706.

6. The general policy of the Department of Commerce in regulating exports is expressed in 15 C.F.R. § 370.1(a, b), in pertinent part:
"(a) *Purposes for controls over exports.* Export controls administered by the U. S. Department of Commerce under the Export Administrative Act, are used to the extent necessary:
"(1) To protect the domestic economy from the excessive drain of scarce materials and to reduce the serious inflationary impact of abnormal foreign demand;

United States Export Controls—Past, Present, and Future, 67 Colum.L.Rev. 791, 813 (1967). Accord, Davis, The Regulation and Control of Foreign Trade, 66 Colum.L.Rev. 1428, 1452 (1966). The questions presented in this case relate, however, to when a validated license is required, and not to whether or not one has been properly denied.

Section 2405(b) provides:

"Export to Communist-dominated nations; penalties

"(b) Whoever willfully exports anything contrary to any provision of this Act [sections 2401 to 2413 of this Appendix] or any regulation, order, or license issued thereunder, with knowledge that such exports will be used for the benefit of any Communist-dominated nation, shall be fined not more than five times the value of the exports involved or $20,000, whichever is greater, or imprisoned not more than five years, or both."

Defendants aim their vagueness challenge at the phrase "for the benefit of any Communist-dominated nation." They argue that the words "Communist-dominated" are overly vague because reasonable men could differ as to which countries are covered by the statute. They query whether the term includes or has included countries such as Syria, Egypt or Chile. They note in particular that 15 C.F.R. § 370.11, which establishes seven groups of countries for export control purposes, distinguishes between nations that might arguably be classified as "Communist-dominated."

As for the phrase "for the benefit of", defendants question whether "if one exports goods to a non-Communist dominated nation and knows that the goods may be used in some remote manner to aid, promote, or for the advantage of a Communist-dominated nation, he is committing a crime" (Brumage brief, p. 10). Consequently, defendants maintain that § 2405(b) fails to set standards apprising an individual that his conduct might be criminal, and does not afford these defendants sufficient information as to the crime here alleged.

■■ The concept of vagueness as a basis for a constitutional challenge of a statute involves a number of interrelated constitutional principles. Fittingly, perhaps, the "void for vagueness" doctrine is not easy to define. Nevertheless, the modern concept of the doctrine as a command of due process stresses two aspects: (1) fair warning to the potential criminal offender, and (2) standards sufficiently precise to guide the court

---

"(2) To further significantly the foreign policy of the United States and to fulfill its international responsibilities; and

"(3) To exercise the necessary vigilance over exports from the standpoint of their significance to the national security of the United States.

"(b) *Continuing review of commodity controls.* (1) In accordance with the provisions of the Export Administration Act of 1969, it is the policy of the Department of Commerce to conduct a continuing review of commodities under its licensing jurisdiction to assure that validated export licenses are required for the purposes cited in paragraph (a) of this section. Particular emphasis is placed in the Act on the review of commodities controlled for national security reasons. In this connection, commodities presently under validated license control are reviewed to determine whether such control is still warranted; commodities that may be exported under general license to most destinations are examined to ascertain whether validated license controls should be extended to additional country groups."

Foreign countries are separated into seven groups, designated (at the time of the events herein) by the symbols S, T, V, W, X, Y and Z (15 C.F.R. § 370.2(a)(7) (1971)) in Supplement No. 1 to Part 370.

Group W contains Poland and Romania.

Group Y contains Albania, Bulgaria, Czechoslovakia, East Germany, Estonia, Hungary, Latvia, Lithuania, Outer Mongolia and the U.S.S.R.

Group Z contains China (Mainland), Communist-controlled area of Vietnam, Cuba and North Korea.

Explanation of the policies underlying these groupings may be found in 15 C.F.R. § 385.1 (Group Z) and § 385.2 (Groups W and Y).

By way of bulletin, the Department of Commerce identifies the country groups for which a validated license is required for a given commodity (Fairmont's Supplemental Memorandum).

and jury in determining whether a crime has been made out. Amsterdam, The Void-for-Vagueness Doctrine in the Supreme Court, 109 U.Pa.L.Rev. 67, 68 n. 3 (1960). Smith v. Goguen, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974); [7] Papachristou v. City of Jacksonville, 405 U.S. 156, 163, 92 S.Ct. 839, 31 L.Ed.2d 1,10 (1972); Giaccio v. Pennsylvania, 382 U.S. 399, 402–403, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966).

Analysis of the "void for vagueness" cases indicates that the doctrine "has been used by the Supreme Court almost invariably for the creation of an insulating buffer zone of added protection at the peripheries of several of the Bill of Rights freedoms." *Amsterdam, supra* at 75. However, "recognition that the vagueness doctrine is most frequently employed as an implement for curbing [State] legislative invasion of constitutional rights other than that of fair notice . . . does not mean that the doctrine may be indiscriminately invoked to curb all such invasions, or that there is not an actual vagueness component in the vagueness decisions." *Id.* at 87–88.

■ But however uncertain the outlines of the path ahead, there are well-known guideposts a court may follow in dealing with challenges to federal legislation. First, an act of Congress is presumptively valid. United States v. National Dairy Corp., 372 U.S. 29, 32, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963). "A federal statute is not automatically invalidated because difficulty is found in determining whether certain marginal offenses fall within its language." *Id.* Rather, federal courts consistently seek an interpretation which supports the constitutionality of federal legislation. *Id.* The Supreme Court has stated that it has a duty to authoritatively construe statutes where a serious doubt of constitutionality is raised and a construction

of the statute is fairly possible by which the question may be avoided. United States v. 12 200-ft. Reels of Super 8mm. Film, 413 U.S. 123, 93 S.Ct. 2665, 37 L. Ed.2d 500 (1973), citing United States v. Thirty-Seven Photographs, 402 U.S. 363, 369, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971).

■ Second, Congress has broad comprehensive powers "to regulate Commerce with foreign Nations" under Article I, § 8 of the Constitution. United States v. 12 200-ft. Reels of Super 8mm. Film, *supra* 93 S.Ct. at 2667. Cf. Wickard v. Filburn, 317 U.S. 111, 118–129, 63 S.Ct. 82, 87 L.Ed. 122 (1942); N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U. S. 1, 29–32, 57 S.Ct. 615, 81 L.Ed. 893 (1937).

■ Third, judicial review of a statute regulating foreign commerce or related to foreign affairs is more circumscribed where the alleged constitutional infirmity is vagueness than where the vagueness challenge is mingled with a claim grounded upon an independent constitutional guarantee. As the Supreme Court noted in United States v. National Dairy Corp., *supra* 372 U.S. at 36, 83 S.Ct. at 599, involving a challenge to § 3 of the Robinson-Patman Act,

> the approach to "vagueness" governing a case like this is different from that following in cases arising under the First Amendment.

Greater leeway is allowed in the field of regulatory statutes governing business activities where the acts limited are in a narrow category. Papachristou v. City of Jacksonville, *supra* 405 U.S. at 163, 92 S.Ct. 839, citing Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367 (1952) and United States v. National Dairy Corp., *supra*; Smith v. Goguen, *supra* at 415 U.S. 573, n. 10, 94 S.Ct. 1242. See also *Amsterdam, supra* at 74–75. Compare Kent v.

---

7. The doctrine incorporates notions of fair notice or warning. Moreover, it requires legislatures to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent "arbitrary and discriminatory enforcement." *Id.* at 415 U.S. 573, 94 S.Ct. 1247.

Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L. Ed.2d 1204 (1958).

■ Fourth, interrelated with the foregoing distinction, is an element of standing. Defendants in cases having a first amendment component are frequently permitted to challenge a statute on the grounds that its vagueness might infringe on the rights of others, even though it is not invalid as applied to them. However, where such an element is lacking, the general rule is that

> [o]ne to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional.

United States v. Raines, 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960) (and cases cited therein). Cf. Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

■ Fifth, a statute is less likely to be found vague where a "willful" violation is an element of the offense defined. The rationale is that "where the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act that he does is a violation of law." Screws v. United States, 325 U.S. 91, 101–103, 65 S.Ct. 1031, 1036, 89 L. Ed. 1495 (1945). See Berman and Garson, *supra* at 864–66.

The meaning of the phrase "Communist-dominated nation" does not have to be determined in a vacuum. The regulations plainly identify those countries in Europe and Asia to which certain types of goods may not be exported without obtaining a specially validated license. Included are East Germany and Hungary, the two countries involved in this indictment. They and other countries in Group Y are unmistakably identified in the regulations as East European Communist countries. See n. 6 *supra*. Moreover, the Act itself provides for information to exporters, §§ 2403(a)(2) [8] and 2408.[9] So do the implementing regulations, e. g., 15 C.F.R. § 370.11, which clearly contemplate that those engaged in the business of exporting goods abroad will consult with the Office of Export Control so as to conform their business activities with the law. Defendants Fairmont and Brumage are quite clearly within the class of persons subject to the law and regulations and, one might infer, reasonably familiar with export licensing requirements.

■ Viewed in light of the foregoing, defendants' claim of vagueness loses substance and amounts to little more

8. Section 2403(a)(2) provides:
"(2) The Secretary of Commerce shall use all practicable means available to him to keep the business sector of the Nation fully apprised of changes in export control policy and procedures instituted in conformity with this Act . . . with a view to encouraging the widest possible trade."

9. Section 2408 provides:
"In order to enable United States exporters to coordinate their business activities with the export control policies of the United States Government, the agencies, departments, and officials responsible for implementing the rules and regulations authorized under this Act . . . shall, if requested, and insofar as it is consistent with the national security, the foreign policy of the United States, the effective administration of this Act . . . and requirements of confidentiality contained in this Act . . .
"(1) inform each exporter of the considerations which may cause his export license request to be denied or to be the subject of lengthy examination;
"(2) in the event of undue delay, inform each exporter of the circumstances arising during the Government's consideration of his export license application which are cause for denial or for further examination;
"(3) give each exporter the opportunity to present evidence and information which he believes will help the agencies, departments, and officials concerned to resolve any problems or questions which are, or may be, connected with his request for a license; and
"(4) inform each exporter of the reasons for a denial of an export license request."

than a contention that the Act permits the exercise of excessive discretion in implementation. Delegation by the Congress to the President of regulatory authority over foreign affairs, and exports in particular, has been a long-standing practice. See, *e. g.*, Berman and Garson, *supra* at 791–92 n. 1. Any challenge to the delegation contained in this Act would be unavailing in view of past Supreme Court rulings such as Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 74 L.Ed. 2d 179 (1965), which upheld the statutory authority of the Secretary of State to refuse to validate passports of United States citizens for travel to Cuba.[10] Chief Justice Warren explained:

> [B]ecause of the changeable and explosive nature of contemporary international relations, and the fact that the Executive is immediately privy to information which cannot be swiftly presented to, evaluated by, and acted upon by the legislature, Congress—in giving the Executive authority over matters of foreign affairs—must of necessity paint with a brush broader than that it customarily wields in domestic areas. . . . This does not mean that simply because a statute deals with foreign relations, it can grant the Executive totally unrestricted freedom of choice. However, the 1926 Act contains no such grant.[11]
> Zemel v. Rusk, *supra* at 17, 85 S.Ct. at 1281.

Moreover, the Second Circuit rejected an attack on the delegation of authority contained in a wartime predecessor of the Act, 50 U.S.C.App. § 701, in United States v. Rosenberg, 150 F.2d 788, 790 (2 Cir.), cert. denied, 326 U.S. 752–753, 66 S.Ct. 90, 90 L.Ed. 451 (1945). Accord United States v. Bareno, 50 F.Supp. 520, 523–525 (D.Md.1943). See also, United States v. Stone, 452 F.2d 42, 46–47 (8 Cir. 1971), and Samora v. United States, 406 F.2d 1095, 1098 (5 Cir. 1969).

As a federal statute regulating foreign commerce closely related to foreign affairs and national security, § 2405(b) is entitled to the highest presumption of validity. Application of the statute is sought in connection with exports allegedly destined for Hungary and East Germany, which the statute, together with implementing regulations, would comprehend under even the narrowest construction, n. 2 *supra*. As a penal statute, proof of willfulness will be required to permit such a violation to be found. But there is no question that Congress may validly provide a criminal sanction for the violation of rules or regulations which it has empowered the President or an administrative agency to enact. United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563 (1911).[12] Finding that § 2405(b) is

---

10. The Act here in controversy clearly indicates an intention to authorize area restrictions, and the implementing regulation clearly identifies the specific nations involved. In contrast, the court in *Zemel* relied on the history of imposing area restrictions on travel following enactment of the Passport Act of 1926 in concluding that Congress intended "to maintain in the Executive the authority to make such restrictions." 381 U.S. at 8–9, 85 S.Ct. at 1277.

11. Chief Justice Warren quoted the following passage from United States v. Curtiss-Wright Corp., 299 U.S. 304, 324, 57 S.Ct. 216, 223, 81 L.Ed. 255 (1936):
"Practically every volume of the United States Statutes contains one or more acts

or joint resolutions of Congress authorizing action by the President in respect of subjects affecting foreign relations, which either leave the exercise of the power to his unrestricted judgment, or provide a standard far more general than that which has always been considered requisite with regard to domestic affairs."
Zemel v. Rusk, *supra*.
For a discussion of the nature and distribution of federal power in foreign affairs, see Lofgren, United States v. Curtiss-Wright Export Corporation: An Historical Reassessment, 83 Yale L.J. 1 (1973).

12. Cf. United States v. Marti, 321 F.Supp. 59 (E.D.N.Y.1970), upholding the validity of a search by customs agents under regulations

neither vague on its face nor as applied in this case, the court denies defendants' motion to dismiss.

So ordered.

promulgated pursuant to 50 U.S.C. § 2023(a), in which the court noted (321 F.Supp. at 64):

Concern over limiting and controlling exports is a relatively recent phenomenon associated with the use of trade as a direct instrument of diplomacy and war. 50 U.S.C. App. §§ 2021–2032, popularly known as the Export Control Act of 1949; cf. 22 U.S.C. § 401, adopted in 1917 and subsequently amended. Congress has not dealt explicitly with export searches. Nevertheless, the language of the export control statutes and regulations, as well as the practical difficulties in enforcement lead to the conclusion that Congress has authorized, and the Constitution permits, a search to control goods leaving the country without the need for either a lawful arrest or warrant.