## UNITED STATES v. KERTESS et al.
(four cases).
### Nos. 162–165.

Circuit Court of Appeals, Second Circuit.

Jan. 6, 1944.

Edward V. Broderick, of New York City (Harold Harper and S. Bertram Friedman, both of New York City, of counsel), for appellant.

James B. M. McNally, of New York City (Bruno Schachner and Edward C. Wallace, both of New York City, of counsel), for appellee.

Before L. HAND, CHASE, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

1. The first indictment related to the so-called Barth transaction, the facts concerning which are as follows:

October 22, 1940, Leukon cabled defendant from Switzerland, asking for quotations on fifteen ounces of rhodium, fifteen ounces of iridium and one hundred fifty ounces of palladium (all being "platinum group metals"); deliveries were to be made to one Barth. On the same day, defendant replied that he had informed Barth in Cali, Colombia. On October 29, 1940, he further replied, quoting the price and asking that payment be made to the Irving Trust Company, New York. Leukon forwarded these funds as requested. A sale of these metals to Leukon was entered on the books of Chemical Marketing on October 31. Defendant arranged on October 31 for the purchase of these metals and completed the purchase on November 8. He purchased the palladium from a reputable dealer who was dead at the time of the trial. The rhodium and iridium defendant bought from a dealer to whom defendant falsely represented that he was not buying for export. At that time, dealers in platinum group metals sold them only for domestic consumption and customarily asked whether such metals sold by them were to be used domestically.

Some time in October, 1940, defendant had told Heemsoth, president of Heemsoth-Kerner Corporation, a concern which acted as a customs broker and freight forwarder, that defendant "had a shipment of these metals * * * to ship to Colombia"; that they were not to be shipped in the name of Chemical Marketing Company, but that Heemsoth should arrange to have them shipped by, and in the name of, Western Commercial Company, which was to secure the export licenses and other necessary documents, and "to be the only parties known in the transaction"; and that Western Commercial was to buy the metals with funds supplied by defendant. Heemsoth "broached the whole subject" to Gross, president of Western Commercial, telling him that defendant had "some reason for not to wish to handle" the transaction "directly." Gross "was agreeable to proceed in the transaction." On October 21, 1940, Heemsoth prepared

applications for export licenses for fifteen ounces of rhodium, fifteen ounces of iridium and one hundred fifty ounces of palladium, and Gross signed them in the name of Western Commercial as applicant. The applications stated that Western Commercial was the consignor and seller, that the purchaser was Barth of Colombia, and that the licenses were to be sent to Heemsoth. On October 21, Heemsoth forwarded the applications to the State Department which on October 23 countersigned them, so that they became licenses, and sent them, as requested, to Heemsoth. The license applications and the licenses were on the forms prescribed by the regulations. Each of the licenses accordingly stated, "License is hereby granted to the applicant herein mentioned * * * on the following terms and conditions: This license is not transferable and is subject to revocation without notice." Defendant did not supply Western Commercial with any funds; Western Commercial received no order for these metals from Barth or anyone else. Gross had never met defendant and had had no previous dealings with defendant's company, and in this transaction had no dealings with defendant or his company except through Heemsoth.

On October 29, after Heemsoth received the licenses from the State Department, he so advised defendant who then told Heemsoth to send them to defendant as "he would accomplish the shipping of the merchandise himself" and said that "Gross could be out of the picture." On November 13, defendant wrote Heemsoth concerning the licenses "granted in the name of Western Commercial" and saying, "We would like to have this shipment go forward as early as possible and would appreciate your prompt attention in securing Export Declaration and other necessary papers. We attach hereto pro forma invoice covering this lot; such invoice will have to be made on the forms of Western Commercial since the license is in their name. Kindly send us the necessary papers as soon as possible, and we shall despatch the parcel promptly." On November 18, Heemsoth's company prepared the "Shipper's Export Declaration," required by the President's regulations of July 2, 1940, to be filed with the Collector of Customs; in the blank space in the form of declaration calling for "name of actual shipper" there was inserted the statement, "Shipment by Western Commercial Co.," and Barth, Cali, Colombia, was shown as the consignee. Heemsoth's company sent this declaration to defendant on November 18 with a bill for services. The same day, defendant, using the licenses and the false export declaration, exported the metals to Barth on November 19. On the same day, defendant so advised Leukon by letter. The licenses accompanied the shipment and were checked against the export declaration when it was exported, at Miami, Florida, by the deputy Collector of Customs; had the declaration not corresponded with the licenses, export would not have been permitted. Barth, upon receiving the shipment, promptly reshipped it to Chili whence it was at once sent to Rome, Italy, consigned to Siebert.

Gross never received the licenses; neither he nor Western Commercial assigned or attempted to assign them; neither they nor anyone else notified the State Department that Western Commercial did not intend to use them, although Gross, because not supplied with funds, "withdrew from the transaction." Heemsoth, when on the witness stand, asked whether there was anything unusual about defendant's request to have this shipment made, testified, "The only unusual part of it was that it was not to be shipped in his name."

The regulations plainly contemplated that a license was to be issued only to the particular person named in the application; the licenses were not transferable nor were they transferred. Neither defendant nor his company, Chemical Marketing Company, were named in the licenses, those names having been intentionally and deliberately withheld in the applications. The defendant, having exported without licenses, violated the President's regulations and therefore violated 50 U.S.C.A.Appendix § 701. The conviction for this exportation was proper.

The conviction, based upon the second indictment under 18 U.S.C.A. § 88, for conspiracy in connection with the Barth transaction, was also without error, since the jury could properly conclude that the defendant conspired with Heemsoth. For it could properly infer that Heemsoth knew that defendant, the real seller and consignor, intended to export without the legally required licenses and that Heemsoth actively participated in the commission of the crime. That Heemsoth was

not named in the conspiracy indictment was at most an immaterial variance.

■ 2. The two other indictments have to do with an illegal export, and a conspiracy with respect thereto, relating to the so-called Mueller transaction, the facts of which are as follows:

In June, 1942, Murray, a federal internal revenue agent, was engaged in auditing the income tax returns of Chemical Marketing Company. Being dissatisfied with the entries on its books concerning certain rhodium, Murray spoke to the defendant about the matter. Defendant then made a statement of facts to Murray which, on June 26, 1942, defendant set forth in an affidavit signed by him on behalf of, and as president of, Chemical Marketing. At that time, defendant had not been charged with any violation of 50 U.S.C.A. Appendix § 701, nor was there then any intimation of such a charge. In this affidavit, which was introduced in evidence at the trial, defendant made the following statement:

In the summer of 1940, Leukon sent funds to Chemical Marketing for the purchase of sixty ounces of rhodium and Chemical Marketing then made such a purchase; this metal, Chemical sent to Japan to a firm which Leukon had designated as its trans-shipping agent. On January 22, 1941, this rhodium was returned to Chemical Marketing by the Post Office with a notation that Japanese import regulations did not permit the entry of such metal. On January 25, 1941, this rhodium was pledged with Irving Trust Company to secure a loan to Chemical Marketing. On March 24, 1941, part of this loan was paid and Chemical Marketing withdrew from that bank thirty-five ounces of rhodium which was delivered to a Mrs. Betty Mueller. She had identified herself by a letter from Siebert which requested her to call on Chemical and to "collect" from it "the 35 thirty five ounces of rhodium." Entirely apart from this affidavit and Murray's testimony, the evidence clearly and directly shows the following facts: The purchase by Chemical Marketing in June 1940 of the sixty ounces of rhodium with funds supplied by Deutsche Gold Und Silber Scheideanstalt; the effort in June 1940 to export through Japan, of which defendant then notified Gold Und Silber Scheideanstalt, and the failure of that effort; the pledge in January 1941 of the sixty ounces to the Irving Trust Company; the withdrawal from that bank of the thirty-five ounces on March 24, 1941.

In addition, evidence extrinsic to the affidavit shows the following: Defendant, when purchasing the sixty ounces of rhodium, on June 7, 1940, falsely stated to the seller that it was "for domestic production." [1] On June 21, 1940, defendant invoiced "Gold Und Silber Scheideanstalt-Leukon" for the cost of this rhodium; the invoice stated, "Shipment by steamer sailing from Los Angeles on July 2nd, to P. O. Box 279, Kobe." [1a] After this attempted export to Japan had failed, and after the issuance of the President's Proclamation of July 2, 1940, defendant keeping in touch with Barth, attempted, with the aid of Heemsoth, to export to Mexico thirty-five of the sixty ounces of rhodium through a license to be issued in the name of Western Commercial which company filed an application for such a license stating that it was the seller although in fact it was not, as it owned no rhodium. [2] The State Department, on

---

[1] This false statement was thus made before July 2, 1940, when the statute was enacted and the Proclamation issued, but the enactment of such legislation was then imminent.

[1a] The shipment was thus actually made on the date when the Proclamation issued but the mailing seems to have occurred before that date.

[2] On December 23, 1940, defendant wrote Heemsoth asking him to apply for export licenses, in the name of Western Commercial for a shipment of 35 ounces of rhodium and 400 ounces of palladium to one del Valle in Mexico; the letter stated, "Our name is not to appear anywhere on the license." Heemsoth then asked defendant to "procure for us an actual order from the party in Mexico to whom we were to ship the goods." Heemsoth prepared the license applications which were signed by Gross for Western Commercial and which, on December 31, 1940, Heemsoth sent to the State Department. The applications stated that Western Commercial was the seller and consignor and that the ultimate consignee was del Valle in Mexico. On January 22, 1941, defendant wrote Heemsoth that "as per your request" he was enclosing original orders to Western Commercial from del Valle "on which you have applied for export licenses"; such orders were enclosed, dated January 20, 1941. Western Commercial owned no such metals. There is no evidence that defendant or Chemical Marketing ever sold or trans-

February 27, 1941, refused to issue the license to Western Commercial.

On that same day, a woman named Betty Mueller, residing at 1812 Cornelia Street, Brooklyn, bought a steamship ticket to Spain for $119.75, on the S. S. Magallenes, to sail twenty-seven days later, on March 26, 1941. Five days before that sailing, on March 21 (the day on which Chemical Marketing procured the release of the thirty-five ounces of rhodium from the bank) Chemical Marketing debited Leukon $250 with expenses in connection with rhodium and sent an affiliate of Gold und Silber Scheideanstalt a debit memo to that same effect; receipt of that memo was later acknowledged by Gold und Silber Scheideanstalt.[3]

Miss Krist, defendant's secretary and assistant secretary of Chemical Marketing, who had complete charge of all defendant's office files and of the company's office files, testified that, in June 1942, she received from defendant two papers with instructions to give them to Murray and that she then delivered them to Murray; that she had never theretofore seen those papers which had not been in the company's files but which theretofore defendant had kept at his home. These papers, identified by her, were introduced in evidence. One of them was a paper containing the words, "Betty Müller, 1812 Cornelia St., Brooklyn, N. Y. Sailing S. S. Magallenes." The other paper read as follows: "Received from Chemical Mar-

keting Company for special delivery 35 ounces of rhodium. New York March 24, 1941. [signed] Betty Müller." [3a] A woman named Betty Mueller sailed on the S. S. Magallenes for Spain, her ultimate destination being Germany, on March 26, 1941. A witness testified that he knew a Betty Mueller, residing at 1812 Cornelia Street, Brooklyn, that he knew that she was then thus sailing, and that she subsequently wrote him from Spain and then from Germany.

No license was ever issued to Chemical Marketing to defendant or to Betty Mueller for the export of this rhodium. No entries, concerning the return of the sixty ounces of rhodium from Japan in January 1941 and the shipment in March 1941 of the thirty-five ounces, were made on the books of Chemical Marketing until after Murray in June 1942 had made his inquiries; then, for the first time, in June 1942, entries, dated back to December 31, 1941, were made debiting Leukon with the price of the thirty-five ounces of rhodium and showing its shipment to Leukon on March 24, 1941, and crediting Leukon with the remaining twenty-five ounces.

On this evidence the jury could properly find that defendant had exported the thirty-five ounces of rhodium without a license, in violation of the statute and the President's Proclamation.[4]

Defendant contends that he was a mere seller of the rhodium who delivered it to Betty Mueller, the seller's agent, with, at

---

ferred title to such metals to Western Commercial. The applications were rejected on February 27, 1941.

[3] The debit memo, dated March 21, 1941, is addressed to Lickfett, Stockholm. Lickfett was an affiliate of Deutsche Gold Und Silber Scheideanstalt. An accountant who examined the books of Chemical Marketing testified that the books showed a debit, dated March 21, 1941, for expenses for rhodium to a Leukon account, but that he could find no entries in the cash book "to reflect the payment." In a letter dated June 5, 1941, Deutsche Gold Und Silber Scheideanstalt wrote defendant that "your debit note * * * dated March 21st" could not be "negotiated" without "another slight indication in regard" to the matter, and asking for "just a short explanation, so that the entry can be made * * *"

[3a] The evidence shows that in English the name is interchangeably spelled "Müller" and "Mueller"; that the woman who purchased the ticket and who sailed was

sometimes called by the one or the other name; and that while her ticket was issued in the name of "Anna Babette Mueller," she was also known as "Betty Mueller" and "Betty Müller."

Defendant in his brief in this court states: "On March 24, 1941, according to a statement and affidavit given by Kertess * * * a *Mrs. Betty Müller* called upon Kertess * * * with a letter * * * from G. Siebert * * * which requested him to deliver 35 ounces of rhodium to her, *left a receipt for the metal which he then gave her,* and also a slip of paper upon which there appeared her name and address and a statement that she was sailing on the steamship 'Magallenes'. *The S. S. 'Magallenes' sailed from New York for Balboa, Spain, on the 26th day of March, 1941, and she apparently sailed as a passenger.*" (Italics added.)

[4] There was ample evidence from which the jury could properly infer that Betty Mueller, when she sailed, had in her possession the thirty-five ounces of rhodium.

most, knowledge of an intended unlawful act by her, and that therefore defendant neither violated the Proclamation nor was a party to a conspiracy to do so. Defendant's lively participation in the Barth transaction justified an inference that he was rather an active agent of his European associates than a mere seller of goods;[4a] and the manner of his previous efforts to export this rhodium through Mexico, his concealment from the files of the Mueller receipt, his failure to enter the Mueller transaction on the books for fifteen months, and the fact that such an entry was then belatedly made only to avoid difficulties income-tax-wise, all were enough to sustain a finding that he knowingly and actively assisted as a principal in the illegal export. Similar reasoning leads to the conclusion that there was no error in finding him guilty of conspiring with Betty Mueller to violate the Proclamation. The facts here meet the test laid down in United States v. Falcone, 311 U. S. 205, 61 S.Ct. 204, 85 L.Ed. 128, as interpreted in Direct Sales Co. v. United States, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674.[5]

Defendant, however, argues that his affidavit and the entries on Chemical's books made in June 1942 constitute admissions made by him after the commission of the crime and, under the doctrine of Warszower v. United States, 312 U.S. 342, 61 S.Ct. 603, 85 L.Ed. 876, cannot sustain a verdict of guilty unless corroborated by extrinsic evidence as to the corpus delicti. In the Warszower case, the court said that the rule as to corroboration of confessions applies to extra-judicial admissions made after the commission of a crime; as, in that case, the admission had been made before the crime's commission, the statement in the opinion was dictum and perhaps therefore is not to be taken as necessarily applicable to admissions, such as those here, voluntarily made before the accused has been charged with the crime and before there was any intimation that he might be so charged. We

shall, however, not here consider whether such an exception to the rule is proper. It is perhaps doubtful, too, whether the June 1942 entries on the books of Chemical Marketing—not on defendant's books —come within the rule, but we shall assume, arguendo, that they do. However, disregarding them as admissions, those entries, belatedly made, are evidence of defendant's intention to conceal the transaction.

In any event, disregarding those entries, the other evidence amply corroborates the defendant's affidavit. In Daeche v. United States, 2 Cir., 250 F. 566, 571, this court said: "Any corroborating circumstances will serve which in the judge's opinion go to fortify the truth of the confession. Independently they need not establish the truth of the corpus delicti at all, neither beyond a reasonable doubt nor by a preponderance of proof." But even if we were to follow the rule adopted in some other circuits [6] that there must be at least some corroborative proof of the corpus delicti, the evidence here, even minus the June 1942 book entries, is unquestionably sufficient for that purpose. For in those circuits it has been held that corroboration as to the corpus delicti does not mean that, independent of the confession or admission, the evidence must be sufficient to sustain a verdict of guilt, or must establish the facts beyond a reasonable doubt, or cannot be wholly circumstantial;[6a] for otherwise the confession or admission would be admissible merely as cumulative, or as corroborative of the other evidence. Here, without reference to any of defendant's admissions, we have proof that defendant had illegally exported in connection with the Barth transaction; that when he purchased the sixty ounces of rhodium, which he knew was intended for export, he falsely stated to the seller that they were to be used domestically; that, working again with Barth, Heemsoth and Western Commercial, a short time later he had tried much the same device as that used in connection with the Barth transaction

---

[4a] While we do not rely on that fact, we note that the record shows that he testified before a Congressional Committee that he was "active as a representative of the Deutsche Gold Und Silber Scheideanstalt."

[5] We note in passing that, as reputable dealers in such metals took unusual precautions to prevent them from being exported unlawfully, defendant may be said to have been dealing with something like

a "restricted commodity" having "an inherent capacity for harm." See Direct Sales Co. v. United States, supra.

[6] Forte v. United States, 68 App.D.C. 111, 94 F.2d 236, 127 A.L.R. 1120; Pines v. United States, 8 Cir., 123 F.2d 825, 829, 830.

[6a] See, e.g., Gregg v. United States, 8 Cir., 113 F.2d 687, 691; Forte v. United States, supra.

in order to export to Mexico the thirty-five ounces of rhodium; that the very day on which that effort was balked, a woman named Betty Mueller, residing at 1812 Cornelia Street, Brooklyn, bought, for $119.75, a ticket for Spain on the S. S. Magallenes sailing on March 26; that five days before she sailed, defendant sent Deutsche Gold Und Silber Scheideanstalt a debit slip for $250 expenses relating to rhodium, and that Deutsche Gold Und Silber Scheideanstalt subsequently acknowledged receipt of that memo; that defendant had in his possession, but had secreted from his office files, a receipt signed by one Betty Mueller, dated March 24, for 35 ounces of rhodium and a paper containing the name Betty Mueller, showing her address as Cornelia Street, Brooklyn, and a notation indicating that she was sailing on the S. S. "Magallenes" on March 26; that a Betty Mueller who had there resided did sail on that ship on that date bound ultimately for Germany; that she subsequently was in Germany. Surely here we find adequate corroboration of the export by defendant of the rhodium without a license.

Defendant argues that, aside from his affidavit, required proof is lacking that the Betty Mueller named in the papers in defendant's possession was the Betty Mueller who sailed on March 26. We cannot agree. Circumstantial proof of that fact suffices [7] and exists here in the striking facts that one of those papers gives the correct address of the Betty Mueller who sailed and a correct notation as to the date of her sailing and of the vessel on which she sailed, while the other paper, the receipt signed "Betty Müller," was dated two days before that sailing.

We see nothing in the suggestion that the delivery of those papers to Murray in June, 1942, constituted an admission which itself requires corroboration; even making the doubtful assumption that it would have constituted such an admission if the proof were merely that defendant delivered papers to Murray, we have the testimony of Miss Krist that it was she and not the defendant who gave them to Murray and that they had previously been secreted by defendant for fifteen months.

 4. Defendant asserts as prejudicial error the fact that on the voir dire the prospective jurors were asked whether they had any connection with the governments of Germany, Japan or Italy, or were members of any specified organizations friendly to the fascist movement in those countries or of American organizations which might be disloyal; whether they dissented from the declaration of war, or had a desire for a negotiated peace; whether they had received decorations or citations from any of those countries; and the like. Considering the nature of the evidence brought out at the trial, we see no impropriety in such questions.

Affirmed.

[7] See, e.g., Ford v. United States, 9 Cir., 10 F.2d 339, 350, affirmed 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793; Oregon Steamship Co. v. Otis, 100 N.Y. 446, 454, 3 N. E. 485, 53 Am.Rep. 221; Hartzell v. United States, 8 Cir., 72 F.2d 569, 578, certiorari denied 293 U.S. 621, 55 S.Ct. 216, 79 L.Ed. 708; Gridley v. United States, 6 Cir., 44 F.2d 716, 740.