**UNITED STATES v. ROSENBERG et al.**

No. 8.

Circuit Court of Appeals, Second Circuit.
July 17, 1945.

Writ of Certiorari Denied Oct. 15, 1945.
See 66 S.Ct. 90.

See also 47 F.Supp. 406.

Henry G. Singer, of Brooklyn, N. Y. (Sol L. Firstenberg, of New York City, on the brief), for appellant Rosenberg.

M. M. Kreindler, of New York City (Abraham S. Robinson and Sol L. Firstenberg, both of New York City, and Harry Silver, of Brooklyn, N. Y., on the brief), for appellant Freier.

M. M. Kreindler, of New York City (Sol L. Firstenberg, of New York City, on the brief), for appellants Ferenc Weisz, Ernest Weisz, and Irene Weisz.

Sol L. Firstenberg, of New York City (M. M. Kreindler, of New York City, on the brief), for appellant Friedman.

Harry E. Kreindler, of New York City (M. M. Kreindler and Sol L. Firstenberg, both of New York City, on the brief), for appellant Eisler.

Vine H. Smith, Asst. U. S. Atty., of Brooklyn, N. Y. (Milo F. McDonald, U. S. Atty., of Brooklyn, N. Y., on the brief), for appellee.

Before SWAN, CHASE, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

The seven defendants herein were convicted under the usual conspiracy statute, 18 U.S.C.A. § 88, of conspiring to export platinum without a license, in violation of Presidential Proclamation 2413, 54 Stat. 2712, 3 CFR, Cum.Supp., 164, issued pursuant to Section 6 of the Act of July 2, 1940, 54 Stat. 714, 50 U.S.C.A. Appendix, § 701. They were indicted with two others, of whom one eventually pleaded guilty and became a witness for the prosecution at the trial, and the other obtained a severance. These defendants demurred to the indictment on several grounds, of which those still most pressed are that the statute is unconstitutional, as an improper delegation of legislative power to the executive, and that

the prosecution is unauthorized because the statute by its terms had expired prior to the trial. But the District Court overruled the demurrers in a reasoned opinion, D.C.E. D.N.Y., 47 F.Supp. 406, and upon their conviction after a month's trial before a jury gave each of them a substantial sentence of both fine and imprisonment. This appeal followed.

Before considering the claimed errors at the trial, we shall dispose of the important issues of law stated above. The constitutional objection is based upon the grant of authority to the President to prohibit the export of munitions or supplies of war whenever he "determines that it is necessary in the interest of national defense" to do so.[1] Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446, stated limits to the power of Congress to delegate its legislative powers to the President; and A. L. A. Schechter Poultry Corporation v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, and United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914, held unconstitutional grants of authority to the executive to formulate both policy and the applicable standard. There is some thought that these precedents have lost vigor of recent years; be that as it may, we are clear that they do not apply here, for the statute does itself define policy and set a definite standard. This was part of an extensive statute "to expedite the strengthening of the national defense," 54 Stat. 712, passed just after the fall of France, when the invasion of England appeared imminent. Those were days of fear and stress for us, as well as for our later allies; that Congress, having defined the policy of prohibiting or curtailing supplies needed for defense, could not leave to the Chief Executive, the Commander in Chief of the Army and Navy, the time and detail of its execution would surely seem a harsh, impractical rule, and one more strict than the precedents support. Kiyoshi Hirabayashi v. United States, 320 U.S. 81, 102, 103, 63 S.Ct. 1375, 87 L.Ed. 1774; National Broadcasting Co. v. United States, 319 U.S. 190, 216, 63 S.Ct. 997, 87 L.Ed. 1344; United States v. Randall, 2 Cir., 140 F.2d 70; United States v. Von Clemm, 2 Cir., 136 F.2d 968, 970, certiorari denied 320 U.S. 769, 64 S.Ct. 81, 88 L.Ed. 459. Moreover, the delegation of authority may be upheld on another ground, that of the traditional dominance of the Executive in the conduct of foreign affairs. The statutes involved in the Schechter and Butler cases dealt with purely internal affairs, while the statute here in issue provided for "national defense" by regulating "exportation" of war munitions, and thus concerned very vitally this country's relations with foreign nations. In fact the leading case which points out the President's greater power over the conduct of international affairs and freedom from restriction to an extent not permitted in internal matters, United States v. Curtiss-Wright Export Corporation, 299 U.S. 304, 322, 57 S.Ct. 216, 81 L.Ed. 255, cited as examples of such power the early acts of 1794 and 1795, 1 Stat. 372, 401, 444, authorizing the President to lay, regulate, and revoke embargoes and to permit the exportation of arms and military stores, notwithstanding statutory prohibitions. See also Panama Refining Co. v. Ryan, supra, 293 U.S. 388, 422, 55 S.Ct. 241, 79 L.Ed. 446; United States v. Bareno, D.C. Md., 50 F.Supp. 520, 522, 523; United States v. Kertess, 2 Cir., 139 F.2d 923, certiorari denied Kertess v. United States, 321 U.S. 795, 64 S.Ct. 847, 88 L.Ed. 1084; McDougal and Lans, Treaties and Congressional-Executive or Presidential Agreements: Interchangeable Instruments of National Policy, 54 Yale L. J. 181, 244-255, 1945. We do not doubt the validity of the statute.

Next as to the claim that all prose-

---

[1] As originally passed, the statute provided: "Whenever the President determines that it is necessary in the interest of national defense to prohibit or curtail the exportation of any military equipment or munitions, or component parts thereof, or machinery, tools, or material, or supplies necessary for the manufacture, servicing, or operation thereof, he may by proclamation prohibit or curtail such exportation, except under such rules and regulations as he shall prescribe. Any such proclamation shall describe the articles or materials included in the prohibition or curtailment contained therein." Then, after stating penalties for violations of the statute, proclamations, or regulations, it concluded: "The authority granted in this section shall terminate June 30, 1942, unless the Congress shall otherwise provide." Act of July 2, 1940, § 6, 54 Stat. 714, 50 U. S.C.A.Appendix, § 701. It was made applicable to territories, dependencies, and possessions of the United States on May 28, 1941, 55 Stat. 206, 50 U.S.C.A.Appendix, § 702, and was greatly extended in 1942, as shown in note 2, infra.

cution must cease on June 30, 1942, when, according to its terms, the original statute expired, we think the answer not at all in doubt. Though the trial was had in the fall of 1942, the alleged acts of conspiracy occurred between February and July, 1941. And on June 30, 1942, Congress enacted what it termed an amendment to this very statute, extending its date of expiration to June 30, 1944, and providing even further that it should remain in effect thereafter for the purpose of sustaining any prosecution under it.[2] Defendants contend vigorously, however, that, notwithstanding this plain assertion of legislative intent, the later act is not an amendment, but a new and substitute statute which cannot be read so as to extend the old provisions. But they fail to suggest any persuasive ground for this contention. True, because of this country's entry into the war, Congress thought it wise to broaden the President's powers so as to remove all boundaries from the category of articles subject to export control. But it did not alter the earlier penalties. See United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181; Posadas v. National City Bank of New York, 296 U.S. 497, 56 S.Ct. 349, 80 L. Ed. 351. And it seems absurd to contend that Congress, in extending the scope of the Act, meant those who violated the earlier, more limited statute to escape prosecution. True, the later statute also specifically designated the Board of Economic Warfare as the agency of control. But this, too, was neither new nor repugnant to the earlier statute. For the President as early as September 15, 1941, had instructed the Board to "exercise and perform all powers and functions * * * under section 6 of the act of July 2, 1940." Executive Order 8900, 3 CFR, Cum.Supp., 1009; see United States v. Bareno, supra.[3] Actually the 1942 Act simply continued the then existing system of administration. It must be read as postponing the date of expiration of the 1940 Act and as authorizing the present prosecution. This was the conclusion not only of the learned judge below, but also of Judge Kennerly in United States v. 251 Ladies Dresses, D.C.S.D. Tex., 53 F. Supp. 772, and United States v. 8 Automobiles, D.C.S.D. Tex., 53 F.Supp. 775.[4]

The claimed errors at the trial require consideration of the evidence for the prosecution. On February 1, 1941, defendants Rosenberg and Freier met with the coconspirators Hersch Neumann, Abe Neumann, and Arnold Weisz at the office of a friend

---

[2] This Act, entitled as one "to further expedite the prosecution of the war by authorizing the control of the exportation of certain commodities," provided: "That section 6 of the Act of July 2, 1940 (54 Stat. 714) is hereby amended to read as follows:

"Sec. 6. (a) The President is hereby authorized to prohibit or curtail the exportation of any articles, technical data, materials, or supplies, except under such rules and regulations as he shall prescribe.

"(b) Unless the President shall otherwise direct, the functions and duties of the President under this section shall be performed by the Board of Economic Warfare.

"(c) [Penal provisions, in terms substantially identical with those of the 1940 Act.]

"(d) The authority granted by this section shall terminate on June 30, 1944 or upon any prior date which the Congress by concurrent resolution, or the President, may designate; except that as to offenses committed, or rights or liabilities incurred prior to such date, the provisions of this section and such rules, regulations, and proclamations shall be treated as remaining in effect for the purpose of sustaining any suit, action, or prosecution with respect to such right, liability, or offense." 56 Stat. 463, 50 U.S.C.A.Appendix, § 701.

By Act of July 1, 1944, c. 360, 58 Stat. 671, 50 U.S.C.A.Appendix, § 701, the "Foreign Economic Administration" was substituted for the "Board of Economic Warfare," and the expiration date was extended to June 30, 1945.

[3] This case has a detailed statement of how the general regulations under the Act were promulgated and administered, as well as a convincing showing that the delegation and redelegation of authority was an appropriate means of carrying out the legislative purpose.

[4] In view of this conclusion we need not consider the government's further contention that the same result follows either under the general statute, 1 U.S. C.A. § 29, passed originally in 1871, which provides that the repeal of a statute shall not affect existing liabilities under it unless otherwise expressly provided, or under the amendment to it, which extended its terms to "the expiration of a temporary statute" and which was adopted March 22, 1944, c. 123, 58 Stat. 118, while these proceedings were still pending by virtue of the appeals.

at 50 Pine Street, New York City, and discussed generally the possibility of profitably exporting platinum to Europe. So Hersch Neumann, with the knowledge and approval of this group, sent a cablegram to the Lisbon house of Salzberg & Alt to ascertain the price of platinum and whether "there is any market to sell platinum"; and to this he received a favorable reply. Then the brothers Hersch and Abe Neumann, together with Rosenberg, took an office in the office building at 50 Pine Street. Thereafter between February and May, 1941, the conspirators made four shipments of platinum by boat to Lisbon, Portugal. The general pattern followed by the conspirators was the purchase of platinum from precious metal dealers in New York; the forwarding of platinum to Lisbon by bribing members of the personnel of ships plying between that port and New York to carry the packages secretly; the sale of the metal in Lisbon or Zurich, Switzerland, by Salzberg & Alt; and distribution of the proceeds among at least some of the coconspirators. During all this time the conspirators were well aware that they required a license to export platinum, since they had been so advised by dealers from whom they made their purchases and with whom they signed agreements that the metal was for domestic consumption only.

After the first shipment to Portugal, Abe Neumann, Hersch Neumann, Freier, Rosenberg, Arnold Weisz, Koppel (the defendant who pleaded guilty), and Irene Weisz met and decided to take some platinum to Canada. Thereafter Koppel, Arnold Weisz, Freier, Rosenberg, and the two Neumanns contributed funds for the purchase of 120 ounces of platinum; and Abe Neumann, Arnold Weisz, and Irene Weisz took part of the purchase to "Ernest Weiss's place to give it over to him," where it was packed by Ferenc Weisz in a suitcase with a double bottom.[5] Ernest Weiss then took the platinum to Canada, but brought it back without making a sale there because he was afraid to sell. Thereafter Ferenc returned the platinum to the others, who later shipped it to Portugal.

About May, 1941, Arnold Weisz undertook to send further parcels to Lisbon by means of airplanes leaving LaGuardia Airport for the transatlantic flight. For this purpose he purchased platinum through a confederate named Felsenberg. He then asked Mezenen, a flight steward on clipper ships making flights to Lisbon, to take some platinum across. But since Mezenen was not flying he suggested that he would turn the shipment over to a costeward named Mario, which he did. After two shipments were completed in that way, Arnold Weisz on the evening of June 4, 1941, desiring to make a further shipment, rode in a taxicab to Mezenen's residence and there delivered to him a package of platinum and various pieces of paper. This package and the papers were found on Mezenen when he was arrested the following day while proceeding to the airport. Defendant Friedman was with Weisz on the trip to Mezenen's residence.[6]

Defendants attack the sufficiency of the proof to convict; but in addition, each vigorously asserts the prejudicial effect upon his case of a variance from the charge of a single conspiracy to the proof of three separate and distinct conspiracies: the boat shipments, the trip to Canada, and the shipments by clipper. This claim, not at all unusual in a conspiracy case, is here developed with such earnestness as to constitute, with the legal issues considered above, the chief grounds of this appeal. There can be no doubt, however, that at least the Canadian transaction was closely tied to the scheme to ship platinum to Portugal. For the most part the same parties were involved; the trip to Canada occurred in the interim between the first and second shipments by boat; the platinum used was part of a larger purchase and was finally sent to Portugal. Nor is the cry of variance justified with respect to the proof of shipments by airplane. Though these are somewhat more disconnected from the other transactions, so far as the proof shows, we may not usurp the place of the jury to view them as entirely separate matters. The United States did show that Arnold Weisz, one of the chief conspirators, participated in all the transactions; that he had at some time discussed the possibility of airplane shipments with Hersch Neumann; and that

---

[5] Ernest Weiss is a brother of Arnold Weisz and of defendants Ferenc and Irene Weisz, notwithstanding differences in the spelling of the surname.

[6] Of the conspirators named in the indictment, the two Neumanns, Koppel, and Mezenen testified for the government. Six of the defendants testified in defense; Irene Weisz did not take the stand. Arnold Weisz, key figure in the conspiracy, was not present at the trial.

these shipments were started at about the time of the last shipment by boat. This was sufficient to justify the jury, in the light of the careful instructions it received from the court, in finding a close interrelation between this and the other transactions. United States v. Valenti, 2 Cir., 134 F.2d 362, certiorari denied Valenti v. United States, 319 U.S. 761, 63 S.Ct. 1317, 87 L.Ed. 1712; United States v. Cohen, 2 Cir., 145 F.2d 82, certiorari denied Cohen v. United States, 323 U.S. 799, 65 S.Ct. 553.

■ But even were we to conclude that the airplane scheme was not connected with other transactions, the objection is not of serious consequence in the present setting. For as this court pointed out in the Cohen case, supra, 145 F.2d 82, 88, 89, per L. Hand, J., "it comes to no more than that, instead of being tried upon a single 'scheme,' the accused were tried upon three 'schemes' at the same time. As variance, it would not have mattered if the prosecution had wholly failed to prove any joint 'scheme' at all; but had only proved the two local ones. Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314, definitively held that the question in each case was whether any practical prejudice resulted to the accused from such a variance." Here no such prejudice appears. Just as in the Cohen case, all the transactions are crimes of the same kind and could have been joined and pleaded in separate counts, even though the confederates were not the same in all. 18 U.S.C.A. § 557; United States v. Liss, 2 Cir., 137 F.2d 995, 998, certiorari denied Liss v. United States, 320 U.S. 773, 64 S.Ct. 78, 88 L.Ed. 462; United States v. Twentieth Century Bus Operators, 2 Cir., 101 F. 2d 700, certiorari denied Twentieth Century Bus Operators v. United States, 307 U.S. 624, 59 S.Ct. 821, 83 L.Ed. 1502; United States v. Tuffanelli, 7 Cir., 131 F.2d 890, 893, 894, certiorari denied Tuffanelli v. United States, 318 U.S. 772, 63 S.Ct. 769, 87 L.Ed. 1142. And the indictment clearly set out overt acts involving all the transactions and in every way provided all the notice to the accused which can be considered at all required in criminal prosecutions. United States v. Fried, 2 Cir., 149 F.2d 1011; United States v. Wodiska, 2 Cir., 147 F.2d 38; United States v. Achtner, 2 Cir., 144 F.2d 49. Nor were defendants prejudiced by irrelevant evidence. We shall refer more in detail below to two specific objections stressed on this appeal; here it is sufficient to say that the challenged evidence either so directly concerned only a single conspirator's participation as not to confuse, or, where it was of wider significance, was relevant background material as to a conspirator participating in all the transactions. United States v. Liss, supra; Marino v. United States, 9 Cir., 91 F.2d 691, 113 A.L.R. 975, certiorari denied Gullo v. United States, 302 U.S. 764, 58 S.Ct. 410, 82 L.Ed. 593; United States v. Compagna, 2 Cir., 146 F.2d 524, 530, certiorari denied Compagna v. United States, 65 S.Ct. 912.

■ Passing this objection of variance, therefore, the evidence against these defendants appears clearly sufficient to go to the jury. Thus Rosenberg and Freier were at the very heart and center of the conspiracy. Ferenc Weisz, in addition to his connection with the Canadian transaction already noted, was shown to have acted as agent for his brother Arnold in receiving in the latter's behalf part of the proceeds from one of the shipments by boat. He also typed an insurance policy whereby Freier guaranteed his associates against loss. Irene Weisz, in addition to her activities already discussed, carried the platinum which Ernest Weiss had returned from Canada, and which Ferenc Weisz had brought back to the office of the Neumann brothers, from that office to the office of her brother Arnold, for the purpose of transferring it to Silva, an officer of the ship "Pero d'Alerlquer," for transmission to Lisbon. She was also present at a meeting which discussed a further shipment to Portugal on the ship "Guine" and obtained passes in the name of her brother Ernest to go aboard that vessel for the purpose of interviewing a member of the crew. Again she brought to the Neumanns' office money which Arnold Weisz owed to the conspirators as his contribution to one of the boat shipments. In addition to Ernest Weiss's activities in connection with the Canadian transaction, the evidence showed a payment to his bank account from the Chase National Bank of $8,943; and the jury was not limited in the inferences it might draw by his own testimony that he knew no more than that this money belonged to his brother Arnold and that he paid it all to Arnold.

Possibly somewhat more doubt may exist as to the defendants Friedman and Eisler; but, if so, it was a doubt to be resolved by the jury. Thus Friedman, who rode in the taxi with Arnold Weisz when the latter delivered the platinum to Mezenen, denied any knowledge prior to Arnold's delivery of

the package that it contained platinum. The jury, however, was justified in drawing a different conclusion, particularly in the light of his conflicting statements about the trip shown by a government agent and the further conflict with his testimony at the trial. Moreover, he had also written or hand printed various cables for Arnold Weisz, as well as the delivery instructions given Mezenen. One of these cables, inquiring into the possibility of purchasing platinum from Chile, was sent long before the airplane transactions. Although Friedman admitted having prepared these papers, he claimed that he did not know some of them referred to platinum, and also that he did not know of anything wrong in these transactions; but the issue was thus one for the jury. United States v. Wodiska, supra, 2 Cir., 147 F.2d 38, 39; United States v. Rosenberg, 2 Cir., 145 F.2d 653, 654, 655; United States v. Marino, 2 Cir., 141 F.2d 771, 772, 773, certiorari denied Marino v. United States, 323 U.S. 719, 65 S.Ct. 48.

As to Eisler, the prosecution showed that in order to accomplish the first boat shipment of platinum, Rosenberg, carrying platinum in his pocket, and accompanied by Hersch Neumann, went to Eisler's office. Rosenberg entered the office while Neumann waited outside. After ten minutes Neumann went into the office and found Rosenberg and Eisler engaged in a conversation. When Rosenberg came out he did not have the platinum with him. Since the platinum was later received in Lisbon, and since Eisler admitted that he knew the first officer of the "Concalho Velho," the jury could properly infer that Eisler engineered the final stages of the shipment. Even though this may not show Eisler's direct knowledge of the full nature of the scheme and of the participation of other conspirators, the complicated nature of the transaction was sufficient in itself to tell him that Rosenberg had not been acting alone; this was clearly sufficient to make him a coconspirator with the others. United States v. Compagna, supra, 2 Cir., 146 F.2d 524, 536; United States v. Liss, supra, 2 Cir., 137 F.2d 995, 1000, 1001. And as we have pointed out above, under the circumstances here shown Eisler would have been properly convicted even had he thought Rosenberg the only coconspirator and even had this particular transaction in fact been separate and distinct from the others.

The trial was long and was fairly conducted. Most of the errors assigned as to it depend on the contention discussed above that the proof showed three separate and distinct conspiracies, instead of the single one charged. We need note further only certain of the objections to the admission of evidence. The court properly allowed testimony to the effect that Freier entered into a written agreement with Arnold Weisz and Rosenberg insuring their interest against loss in case the United States entered the war. Whatever Freier did to induce or make attractive the continuance of his confederates in the illicit business was probative against him. And, once the conspiracy was established, it was relevant as against the others as incidental to the transactions effectuating the illegal scheme. The court also committed no reversible error in admitting a statement of Friedman's bank account, showing large deposits during the period here involved, as well as the platinum which was taken from Mezenen. Both these exhibits were certainly relevant as against Friedman. Again they became relevant against the other defendants, once the conspiracy was shown (as indeed the court stated in making its rulings). Even had the defendants' theory of separate and distinct conspiracies been accepted, none of this evidence had enough connection with separate conspirators to suggest prejudice. Freier's agreement implicated himself and his promisees only; Friedman's access of wealth had little bearing on remote conspirators; while the admission of the platinum, even though it was the only production of "the valuable metal for all to behold," as defendants say, can hardly have been so dazzling in view of the convincing evidence of the other extensive dealings in platinum. The necessity of weighing the evidence separately as to each accused was brought home to the jury by the court's detailed charge and statement as to each one.

Affirmed.

CHASE, Circuit Judge (concurring).

I concur but, as I believe that the delegation of power to the President found in Sec. 6 of the Act of July 2, 1940, 54 Stat. 714, 50 U.S.C.A. Appendix § 701, is valid on the second ground stated in the opinion, rely only upon that. It is enough that the delegation concerned the conduct of the foreign affairs of this country, United States v. Curtiss-Wright Export Corporation, 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255.