**UNITED STATES of America,**
**Appellee,**

v.

**Andrew L. STONE et al., Defendants,**

and

**Amerbel Corporation and Joseph L. Wilmotte & Co., Inc., Successor to Amerbel Corporation, Appellants.**

**No. 20513.**

United States Court of Appeals,
Eighth Circuit.

Dec. 16, 1971.

Rehearing Denied Jan. 14, 1972.

John J. Cole, St. Louis, Mo., for appellants.

James M. Gordon, Asst. U. S. Atty., St. Louis, Mo., for appellee.

Before LAY, HEANEY and BRIGHT, Circuit Judges.

BRIGHT, Circuit Judge.

Amerbel Corporation (Amerbel) and its successor, Joseph L. Wilmotte & Co., Inc. (Wilmotte), appellants herein, New York corporations, were indicted with others, for conspiring to export from the United States to a foreign country "certain arms, munitions and implements of war listed in the United States Muni-

tions List, without having first obtained therefor an export license or written approval of the Department of State," as is required by provisions of the Mutual Security Act (Title 22 U.S.C. § 1934),[1] and the rules and regulations promulgated thereunder (22 C.F.R. § 121.01 et seq.). The indictment also named the Chromcraft Corporation and its successor, Alsco, Inc. (Chromcraft-Alsco), of St. Louis, Missouri, manufacturer of rocket launchers and rocket launcher components, and two of its officers, Andrew L. Stone, President, and Evelyn R. Price, Executive Secretary, as defendants. Also included was Les Forges de Zeebrugge (Zeebrugge), a Belgian arms manufacturer and importer of the armaments in question, as coconspirator but not as codefendant. The indictment covered the period of July 1, 1961 to January 1, 1969.

Chromcraft-Alsco pleaded guilty to a related substantive charge contained in the indictment and its officers, Stone and Price, pleaded guilty to the conspiracy count here under consideration. Amerbel and Wilmotte, after pleas of not guilty, stood trial before a jury. After a finding of guilty, the district court levied fines of $10,000 and costs against each. Wilmotte, for itself and as successor to Amerbel, prosecutes this timely appeal, seeking alternatively an entry of judgment for acquittal, a new trial, or a dismissal as against Amerbel. We affirm the judgments of conviction entered by the district court but determine that only one $10,000 fine may be levied against the defendant corporations for their conspiratorial conduct during the period covered by the indictment.

Joseph L. Wilmotte, an immigrant from Belgium, organized the subject corporations, Amerbel and Wilmotte, in 1956. The corporation, Wilmotte, engaged principally in the importing and exporting of steel products. Amerbel, an abbreviated version of America to Belgium, functioned principally as a purchasing agent for several Belgian firms, including Zeebrugge. In 1958, Amerbel began purchasing armament components along with other products from United States suppliers, and arranged for their overseas transportation to Zeebrugge in Belgium. In addition to acting as purchasing agent, Amerbel acted as a forwarding agent for orders which Zeebrugge had placed directly with the United States manufacturers, including Chromcraft-Alsco.

Amerbel ceased its corporate existence in 1966 when it merged into Wilmotte. After the merger, the prior functions of Amerbel were handled by the "Amerbel Division" of Wilmotte without any change in the location, management, directors, officers, or operating personnel.

Chromcraft-Alsco during the period of the alleged conspiracy misdescribed and mislabeled rocket launchers and rocket launcher components in filling Zeebrugge's direct orders for these items, designating them as "filter tanks" or some other equally innocuous non-military item. In accordance with these designations, Amerbel and later, the "Amerbel Division" of Wilmotte, prepared the documents necessary for shipment of the articles overseas and showed the consignments as consisting of non-military items. Chromcraft-Alsco also falsified the valuations shown on the invoices and shipping documents which it forwarded to Amerbel-Wilmotte. By us-

---

1. In part, the Act reads:
  § 1934. Munitions control—Authority of President
  (a) The President is authorized to control, in furtherance of world peace and the security and foreign policy of the United States, the export and import of arms, ammunition, and implements of war, including technical data relating thereto, other than by a United States Government agency. The President is authorized to designate those articles which shall be considered as arms, ammunition, and implements of war, including technical data relating thereto, for the purposes of this section.

ing this second invoice Chromcraft-Alsco charged Zeebrugge substantially more for the products than the price which it disclosed on Amerbel-Wilmotte's documents. Amerbel-Wilmotte did, however, receive an agent's commission based upon the lower valuation.

Here, appellants concede that the requisite shipping authorizations for the arms shipments in question were not obtained but deny that the evidence disclosed any conspiratorial conduct on their part. Appellants also question the validity of the statutes and regulations, the propriety of the trial court's instructions and rulings on evidence, the manner in which the trial court communicated with the jury, and the assessment of a fine against Amerbel, a non-existent corporation at the time the indictment was returned.

We turn first to the appellants' argument on sufficiency of the evidence. The crucial question of the participation by Amerbel-Wilmotte in the alleged conspiracy centers around the conduct of Susan E. Katz, who, commencing in 1961, served Amerbel as a telephone operator-clerk typist and by 1966, had advanced to the position of assistant secretary in Wilmotte. In this position, she was given the authority to apply for export licenses. Miss Katz wrote a number of letters for her employer which served to implicate both Amerbel and the "Amerbel Division" of Wilmotte as active participants in the scheme to circumvent the control of the United States over the exportation of war materials. On January 18, 1967, she wrote to Chromcraft concerning certain invoices and packing slips which we needed to arrange for overseas shipment of an order of goods which had been received at New York, stating in part, ". . . we wanted to know if your invoices would state that these were filter tank parts in which case no export license would be required. . . ." On March 8th of that year she wrote Chromcraft inquiring about a January order placed by Zeebrugge with Chromcraft for components of rocket launchers

to be delivered in Belgium in March, advising, ". . . if these invoices are marked Launcher parts, we will have to apply for an export license from the U.S. Department of State. . . ." On March 13th of the following year she wrote Alsco concerning a box of freight that had arrived in New York labeled "filter tank parts," requesting invoices and packing lists by return mail, and stating:

. . . we would like to have some invoices stating that this material is filter tank parts and not what it actually is. This used to be done in the past and in this way, we can give the required dopy [sic] to our forwarder's.

In fact all these transactions related to rocket launcher components. The evidence disclosed that Miss Katz had learned shipping procedures from her supervisors in Amerbel; first from Amerbel's Manager, Larry Kuznick, who served until March of 1963; and later, from Vice-President Maurice Heyne, who also translated Zeebrugge's correspondence written in French.

From other correspondence offered in evidence, it appears that Miss Katz's letters described a continuing course of corporate conduct. In June of 1962 Manager Kuznick of Amerbel wrote President Stone of Chromcraft:

As I have advised you in the past, there is always some considerable difficulty in having the components for the Rockets leave the United States, because of the license required by the State Department.

To-date, we have been rather successful in so far that by using various terms under which many of the articles can be referred, we have been able to expedite shipment without the State Department license.

However, as concerns your two most recent shipments of used LAU–3/A Rocket Launchers for display purposes, we have been unable to find any other terminology or description by means of which shipment can be

made without the State Department license. Subsequently, the four Launchers, your invoice No. G7Z–136, have been sitting in New York for a month awaiting the return of the license from Washington. I must say that the bureaucratic handling in the Capital [sic] over the last year has become much more confusing and time wasting for all matters relating to Rockets.

The jury need not have accepted protestations of defendants' officers of their lack of knowledge of Miss Katz's nonfeasance in failing to obtain proper clearances for the shipments of the war materials in question, particularly since Vice-President Heyne wrote letters describing "filter tank parts" and President Joseph L. Wilmotte of Amerbel-Wilmotte admitted that he knew of no such product.

■ On review, we find ample evidence to support the guilty verdict in this case. Moreover, we think it immaterial whether or not Amerbel-Wilmotte knew of or benefited from Chromcraft-Alsco's double invoicing by which President Stone of Chromcraft apparently had secreted large sums of money in Swiss bank accounts.

The particular substantive violations which underpin the conspiracy count of the indictment rest upon unlawful export or an intent to export, armaments or war materials contained in the United States Munitions List. Whether the appellants' co-defendants violated other federal laws, with or without appellants' knowl-

edge, is extraneous to the charge against them.

■ We also reject appellants' contention that the trial court erred in refusing to allow testimony of the double invoicing practices of Chromcraft-Alsco with Zeebrugge or in refusing to charge the jury that the defendants' financial stake (the amount of its commission) would be a factor for the jury's consideration in determining the existence of the conspiracy.[2] Appellants' reliance on United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940), is misplaced. There the defendants merely sold products to a distiller who in turn produced alcohol in violation of the revenue laws, but in that case there was no showing that those defendants knew of the existence of the conspiracy. Here the proof shows the actual participation by these defendants in an arrangement to export munitions to a foreign country in violation of the law. This conduct clearly falls within the offense of conspiracy as defined in *Falcone:*

> The gist of the offense of conspiracy . . . is [the] agreement among the conspirators to commit an offense attended by an act of one or more of the conspirators to effect the object of the conspiracy. [*Id.* at 210, 61 S.Ct. at 207]

■ Appellants next argue that the rules and regulations promulgated pursuant to 22 U.S.C. § 1934 are unconstitutional as being unlawful delegation of legislative power to the executive.[3] Ap-

2. The district court aptly commented on this contention:

> You say you were cheated out of commissions. You were paid commissions on the basis of the invoices that were there. Now, the fact that they may have charged some money in inflated price on another billing to Zeebrugge has nothing to do with this charge. The fact that there has been another case, or another conspiracy to which these parties, meaning your clients Amerbel and Wilmotte, were not a party, has nothing to do with the proof in this case. The charge of this conspiracy here is solely that you were

part of a conspiracy to ship items that were on the Munitions List from this country, out of this country without obtaining a license. This is a violation of the law, and the fact that you didn't get as much out of it as somebody else is not pertinent to the issues here at all, so I can't make my ruling any clearer than that. . . .

3. Under 22 C.F.R. § 121.01 (1971) rockets and rocket launchers are classified as "Category IV" items on the United States Munitions List which require export licenses from the Department of State under 22 C.F.R. § 123.01.

pellants rely on Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L. Ed. 446 (1935) and A. L. A. Schechter Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935) to support this proposition. This reliance is misplaced. Those cases deal with executive regulation of internal affairs. In cases such as the instant one, involving foreign affairs, the Supreme Court has sanctioned far broader delegations of authority to the executive. *See, e. g.,* Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); United States v. Curtiss-Wright Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936). *See also* Samora v. United States, 406 F.2d 1095 (5th Cir. 1969) (where the constitutionality of 22 U.S.C. § 1934 was upheld); and United States v. Rosenberg, 150 F. 2d 788 (2nd Cir.), cert. denied, 326 U.S. 752, 66 S.Ct. 90, 90 L.Ed. 451 (1945).

We next turn to appellants' contention that the district court erred in failing to dismiss the indictment as to Amerbel because of its 1966 merger into Wilmotte pursuant to provisions of the New York Business Corporation Act.[4] Additionally, Wilmotte contends that since the indictment alleged a single agreement to commit an offense, no double penalty should be assessed against it as both the surviving and merged corporation.

■ We agree with the district court's refusal to dismiss the indictment. Under New York law, a dissolution or merger of a corporation will not preclude the assessment of criminal liability against such malefactor corporation. United States v. Brakes, Inc., 157 F. Supp. 916 (S.D.N.Y.1958). *See also* United States v. Maryland & Virginia Milk Producers, 145 F.Supp. 374 (D.C. D.1956); United States v. Cigarette

Merchandisers Association, 136 F.Supp. 214 (S.D.N.Y.1955); People v. Bankers Capital Corp., 137 Misc. 293, 241 N.Y.S. 693 (1930).

■ Although we find ample case support to sustain the indictment against Amerbel as against a motion for dismissal, we note that none of the above cited cases authorize multiple penalties merely by reason of corporate succession to criminal liability of a predecessor.

In the instant case, the merger of Amerbel into Wilmotte produced no change in the manner of handling Amerbel's business. The same people in the same office functioned in the same way. Although Amerbel ceased to exist as a separate entity in 1966, the "Amerbel Division" of Wilmotte played the same conspiratorial role thereafter. While Amerbel's criminal liability continued under New York law, notwithstanding its merger with Wilmotte, we see no reason to impose a double penalty upon what was essentially a single course of conspiratorial conduct.

In Melrose Distillers, Inc. v. United States, 359 U.S. 271, 79 S.Ct. 763, 3 L. Ed.2d 800 (1959), the Supreme Court determined that a corporation could not through dissolution proceedings under state law avoid criminal prosecution under provisions of the Sherman Act. The decision permitted the continuance of the prosecution against a successor corporation under the same ownership. In support of its view that the state statutes permitted the continuance of the federal action, the Court recited the following as policy reasons to support the result:

> Petitioners were wholly owned subsidiaries of Schenley Industries, Inc.

---

4. § 906 of the New York Business Corporation Act, McKinney's Consol.Laws, c. 4, provides in pertinent part:

The surviving or consolidated corporation shall assume and be liable for all the liabilities, obligations and penalties of each of the constituent corporations . . . . No action or proceeding, whether civil or criminal, then pending by or against any such constituent corporation, or any shareholder, officer or director thereof, shall abate or be discontinued by such merger or consolidation, but may be enforced, prosecuted, settled or compromised as if such merger or consolidation had not occurred. . . .

After dissolution they simply became divisions of a new corporation under the same *ultimate ownership*. In this situation there is no more reason for allowing them to escape criminal penalties than damages in civil suits. As the Court of Appeals noted, a corporation cannot be sent to jail. The discharge of its liabilities whether criminal or civil can be effected only by the payment of money. [*Id.* at 274, 79 S. Ct. at 766. (emphasis added)]

■ We think the application of a similar "ultimate ownership" test is required to determine the issue of a single or double penalty against appellants. Here the same individuals owned and controlled the predecessor and successor corporations. In the assessment of criminal liability on a single conspiracy, as here charged, we think it appropriate to treat the two corporations as one. *Cf.* Braverman v. United States, 317 U. S. 49, 54, 63 S.Ct. 99, 87 L.Ed. 23 (1942).

We recognize conspiratorial agreements may continue over a long period of time and include the performance of many transactions and that new parties may join the agreement at any time while others may terminate the relationship. *See* United States v. Varelli, 407 F.2d 735, 742 (7th Cir. 1969). Here Wilmotte did not enter the conspiracy as a party separate and distinct from the participation of its predecessor. We deem it and Amerbel as one person under the conspiracy statute,[5] and as such, subject to one maximum fine of $10,000.

■ We find little merit in appellants' other contentions on this appeal. The trial court did not abuse its discretion in refusing to enforce the subpoena duces tecum obtained by the defendants and directed to the United States Attorney, which, three days prior to the commencement of the trial, would have required him to produce certain records not directly under his control which were located in Washington, D. C. There is no showing by defendants that any of the requested documents were used by the prosecution or would have been beneficial to the defense. Records introduced by the government at trial had been made available to appellants' counsel long before the trial date. There was no abuse of discretion by the trial court here. *See* Bowman Dairy Co. v. United States, 341 U.S. 214, 71 S.Ct. 675, 95 L.Ed. 879 (1951); United States v. Bearden, 423 F.2d 805 (5th Cir.), cert. denied, 400 U.S. 836, 91 S.Ct. 73, 27 L.Ed.2d 68 (1970).

We find no prejudicial error committed by the trial court in its rulings on evidentiary matters. Appellants sought to introduce evidence of Miss Katz's emotional problems through questions directed at Joseph L. Wilmotte, president of the defendant corporations. The inquiry sought the introduction of hearsay evidence and was properly subject to objection. Appellants also objected to the trial court's permitting the prosecution to introduce sample rocket launchers and their blueprints into evidence without prior notice to appellants' counsel. In essence, appellants contend that the production of these items as exhibits violated the spirit of criminal rule 16(b), Fed.R.Crim.P., relating to disclosure of evidence and exhibits prior to trial. While we think the prosecution should have disclosed its intent to use these exhibits earlier, we find no demonstrable prejudice to appellants by reason of their admission into evidence.

■ Finally, we turn to a consideration of the appellants' allegations that

---

5. The conspiracy statute, 18 U.S.C. § 371, provides:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.
>
> If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

the trial judge committed prejudicial error in informally communicating with the jury without first consulting appellants' counsel.

During deliberations, the jury communicated to the judge its desire to obtain further instructions to clarify the term "conspiracy." The trial judge, without notifying counsel, advised the jury through a message sent by the United States Marshal that the court would re-read the entire charge if the jury so desired. Thereafter, on further request from the jury, the trial court so reinstructed the jury in the presence of counsel for all parties.

The re-reading of the charge to the jury was completed shortly before midnight. The jury resumed its deliberations. Thereafter, counsel for the defendants objected to the length of the deliberations. Following the conference between court and counsel, the court, without further advising counsel, sent an inquiry to the jury asking whether the jury wanted to adjourn for the evening. The jury requested fifteen minutes of additional time. Approximately fifteen minutes thereafter, the jury returned its guilty verdict at 1:15 A.M. These questioned communications between court and the jury seem entirely innocuous and without prejudice to the parties.

■ Moreover, we reject an implicit suggestion contained in appellants' brief that the court should have excused the jury earlier than 1:15 A.M. The control of amount of time spent by a jury in deliberation rests generally in the sound discretion of the trial court, United States v. Pope, 415 F.2d 685 (8th Cir. 1969), cert. denied, 397 U.S. 950, 90 S. Ct. 973, 25 L.Ed.2d 132 (1970), and we find no abuse of such discretion here.

We affirm the judgments of conviction but remand for modification of the fine assessed in accordance with this opinion.